**Entered on Docket**
**February 22, 2010**

_____
**Hon. Bruce A. Markell**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

| | |
|---|---|
| In re:<br><br>MARTIN SHAT and ANJANETTE SHAT,<br><br>Debtors. | Case No.: BK-S-08-23136-BAM<br><br>Chapter 11<br><br>Date:    October 13, 2009<br>Time:   9:30 a.m.<br>Courtroom:  3 |

**OPINION ON ABSOLUTE PRIORITY RULE**

Martin and Anjanette Shat ("***Debtors***") filed for bankruptcy protection under chapter 11 on November 5, 2008. On August 20, 2009, they filed their Third Amended Plan of Reorganization ("***Plan***"),[1] which the court orally confirmed on October 13, 2009.

The only contested issue at the confirmation hearing was whether the "absolute priority" rule of 11 U.S.C. § 1129(b)(2)(B)(ii) applies to individual chapter 11 debtors after passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8 (2005) ("***BAPCPA***"). This court holds that it does not.

**I. FACTS**

The Debtors run a dry cleaning business, known as Flair Cleaners, which they own as a sole proprietorship. It is profitable. They also invested in several residential rental properties. Those are not so profitable.

---

[1] The Debtors filed their plan *pro se*. Previously, the court had denied their requested employment of attorney because of a conflict of interest the attorney had, and because of concerns about his competence to represent individual chapter 11 debtors. That order was appealed and has since been affirmed. *See* Shat v. Kistler (*In re* Shat), 09-1092-MoDK (B.A.P. 9th Cir., Nov. 25, 2009).

The Debtors' Plan classifies their creditors into eight classes. Three of these classes are for creditors holding unsecured claims: one for a prior domestic support obligation; one for mortgage lenders' deficiencies; and one for creditors holding credit card claims.

Seven of the eight classes either accepted the plan or did not vote.[2] The eighth class was Class V, which the Plan labeled as "Miscellaneous General Unsecured Creditors (Credit Card Creditors), With Claims Totaling to Approximately $85,000." Under the Plan, creditors in this class were to be paid "10% of their allowed claims without interest over 5 years." Only one member of this class voted, and it rejected the plan.[3] This dissenting unsecured creditor did not make any objection under 11 U.S.C. § 1129(a)(15) or file any other objection to the Plan.[4]

The Plan provided that, upon confirmation, "the Debtors shall be revested with their assets, subject only to outstanding liens which are not modified or avoided by the Debtors . . . ."

---

[2]Class IV contained seven subclasses, each containing a separate secured claim against the Debtors. Before confirmation, the Debtors had reached agreement with each secured creditor, including each of their mortgage lenders, as to treatment under the Plan.

[3]The creditor rejecting the Plan was Discover Financial Services. It held an unsecured claim of $10,683.09. Its solitary negative vote meant that Class V rejected the Plan, because Section 1126(c) requires creditors holding "at least two-thirds in amount and more than one-half in number of the allowed claims of such class" to vote in favor in order to accept. 11 U.S.C. § 1126(c).

[4]A plan proponent need only satisfy the disposable income test of Section 1129(a)(15) if "the holder of an allowed unsecured claim *objects* to the confirmation of the plan . . . ." *Id*. (emphasis supplied). Here, the dissenting creditor simply cast a ballot rejecting the Plan. It did not file any other document or pleading. This is insufficient to invoke Section 1129(a)(15).

Doing nothing more than casting a rejecting ballot might indicate an objection to the plan, but it is also consistent with the belief that the plan is legally sufficient, coupled with an acknowledgment by the creditor that it will be bound by the decision of a majority of creditors in its class or by an appropriate cramdown.

In contrast, an objection requires more – at a minimum, the objector must affirmatively take a position the plan proposed is objectionable on some legal ground; for example, that it is not proposed in good faith, or that the proposed payment does not return to the creditor its statutory entitlement. As a result, Section 1129(a)(15) does not apply in this case because the dissenting creditor did not also file or otherwise assert any objection to the Plan. *See In re* Roedemeier, 374 B.R. 264, 271 (Bankr. D. Kan. 2007); *In re* Berger, 376 B.R. 42, 47 (Bankr. M.D. Ga. 2007).

## II. "Fair and Equitable" and the Absolute Priority Rule

*A. Confirmation Generally*

As a general matter, a plan of reorganization can be confirmed in one of two ways. If all sixteen paragraphs of Section 1129(a) are satisfied, a plan can be confirmed consensually under Section 1129(a).[5] If, however, a plan proponent satisfies all paragraphs of Section 1129(a) other than the voting requirement of paragraph (8), then the court may still confirm the plan as long as the plan is, among other things, "fair and equitable."[6] This second, nonconsensual, method of confirmation is colloquially referred to as "cramdown."[7]

*B. Historic Treatment of Individual Chapter 11 Debtors and Confirmation*

Given Class V's rejection, the Debtors bore the burden of proving that the Plan was "fair and equitable" in order to confirm their Plan. Acequia, Inc. v. Clinton (*In re* Acequia, Inc.), 787 F.2d 1352, 1358 (9th Cir. 1986). Before 2005, the Bankruptcy Code provided that a plan was "fair and equitable" as to unsecured creditors if it met the following test:

---

[5]There is an additional, uncodified, requirement. Section 1228(b) of BAPCPA provides: "The court shall not confirm a plan of reorganization in the case of an individual under chapter 11 or 13 of title 11, United States Code, unless requested tax documents have been filed with the court." Pub. L. No. 109-8, § 1228(b), 119 Stat. 23, 183 (2005). While the scope of this requirement is unclear, 7 COLLIER ON BANKRUPTCY ¶ 1129.03[17] (Alan Resnick & Henry Sommers, eds., 15th rev ed. 2009), there was no request made in this case.

[6]"[I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

[7]Courts use "cramdown" and "cram down" and "cram-down" interchangeably to refer to nonconsensual confirmation. Indeed, Justice Douglas once combined different forms in the same paragraph. Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. 102, 167 (1974) (Douglas, J., dissenting). The hyphenated version appears to have been the first locution used by a court. New England Coal & Coke Co. v. Rutland R.R. Co., 143 F.2d 179, 189 n. 36 (2d Cir.1944). The earliest print references to the term use either the two-word or the hyphenated form. *Compare* Robert T. Swaine, *Present Status of Railroad Reorganizations And Legislation Affecting Them*, AM. BAR ASS'N, PROCEEDINGS OF THE SECTION ON COMM. LAW 15, 15 (1940) (two-word form) *and* Warner Fuller, *The Background and Techniques of Equity and Bankruptcy Railroad Reorganizations – A Survey*, 7 LAW & CONTEMP. PROBS. 377, 389, 390 (1940) (hyphenated form).

3

      (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

      (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B) (before taking into account changes made by BAPCPA).

Before BAPCPA, most courts applied this provision equally to individual and nonindividual debtors;[8] that is, courts held that these provisions applied to humans and corporations alike. *See, e.g.,* Unruh v. Rushville State Bank, 987 F.2d 1506, 1508 (10th Cir. 1993); Computer Task Group, Inc. v. Brotby (*In re* Brotby), 303 B.R. 177, 195 (B.A.P. 9th Cir. 2003) (assuming applicability for purposes of analysis); *In re* Gosman, 282 B.R. 45, 48 (Bankr. S.D. Fla. 2002); Davis v. Davis (*In re* Davis), 262 B.R. 791, 797 (Bankr. D. Ariz. 2001).

For some, this uniform application effectively meant that no individual debtor could ever confirm a chapter 11 plan. *See, e.g., In re* Gosman, 282 B.R. 45 (Bankr. S.D. Fla. 2002) (may not use homestead as "new value" contribution; exempt property must be devoted to creditors' claims in chapter 11 plan). *See also* Ralph A. Peeples, *Staying In: Chapter 11, Close Corporations and the Absolute Priority Rule*, 63 AM. BANKR. L.J. 65 (1989); Raymond T. Nimmer, *Negotiated Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions*, 36 EMORY L.J. 1009, 1068-82 (1987). This reasoning had the effect of preventing individual debtors from keeping a business under a chapter 11 plan if they did not pay their unsecured creditors in full. Accordingly, had the Debtors filed their case before 2005, their Plan likely could not have been confirmed.

*C. BAPCPA Amendments to 11 U.S.C. § 1129(b)(2)(B)(ii)*

As part of BAPCPA, however, Congress amended Section 1129(b)(2)(B)(ii) with respect to individual chapter 11 debtors. The statute now reads as follows, with the provisions added by BAPCPA in italics:

---

[8] Along the way, however, it took a Supreme Court decision to decide definitively that individual debtors – that is, debtors made of flesh and blood – could even file under chapter 11. Toibb v. Radloff, 501 U.S. 157, 160-61 (1991).

4

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, *except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.*

This clause obviously modifies the absolute priority rule stated in subparagraph (ii). The question is, how extensive is this modification? Specifically, may the Debtors in this case retain their dry cleaning business without paying their unsecured creditors in full? To answer these questions requires an examination of the history of the BAPCPA amendment, and an examination of the role of the absolute priority rule in individual chapter 11 reorganizations.

**1. History of the 2005 Amendments Relating to Individual Chapter 11 Debtors**[9]

BAPCPA origins are in the National Bankruptcy Review Commission created by the 1994 Bankruptcy Reform Act.[10] That Commission delivered its report in 1997,[11] although Congress had begun the process of reform even before the report had been finally issued.[12] The principal purpose of the legislation was to change the rules related to an individual's eligibility for bankruptcy, particularly in chapter 7, by linking the availability of bankruptcy relief to a debtor's income and other means.[13] The initial "means-testing" provisions did not purport to make any changes to chapter 11.

---

[9] The best and most detailed history of this legislation is Susan Jensen, *A Legislative History of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 AM. BANKR. L.J. 485, 533-39 (2005). In another context, this court has previously explored the treatment of individual chapter 11 debtors after BAPCPA. *See* Bruce A. Markell, *The Sub Rosa Subchapter: Individual Debtors in Chapter 11 after BAPCPA*, 2007 U. ILL. L. REV. 67. *See also* Sally S. Neely, *How BAPCPA Changes Chapter 11 Cases for Individuals – or – No, this Is Not Your Mother's Chapter 11!*, Program Materials for ALI-ABA COURSE OF STUDY: CHAPTER 11 BUSINESS REORGANIZATIONS 433-68 (May 14 - 16, 2009).

[10] Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, §§ 601-10 (1994).

[11] NATIONAL BANKRUPTCY REVIEW COMM'N, REPORT OF THE NATIONAL BANKRUPTCY REVIEW COMMISSION (Oct. 20, 1997), *available at* http://govinfo.library.unt.edu/nbrc/reporttitlepg.html.

[12] H.R. 2500, 105th Cong. (as introduced, September 18, 1997). A companion Senate Bill was introduced the day after the Commission issued its report. S. 1301, 105th Cong. (as introduced, October 21, 1997).

[13] H.R. 2500, 105th Cong. § 101 (1997); S. 1301, 105th Cong. § 102 (1997).

5

This changed in 1999, when the Senate was considering the then-current bankruptcy reform bill, S. 625. At that time, the Senate Judiciary Committee added Section 321 to the bill. That amendment provided as follows:

> SEC. 321. TREATMENT OF CERTAIN EARNINGS OF AN INDIVIDUAL DEBTOR WHO FILES A VOLUNTARY CASE UNDER CHAPTER 11.
>
> Section 541(a)(6) of title 11, United States Code, is amended by inserting ''(other than an individual debtor who, in accordance with section 301, files a petition to commence a voluntary case under chapter 11)'' after ''individual debtor''.[14]

The section-by-section portion of the *Senate Report* accompanying the bill as ultimately passed by the Senate simply stated that "[t]his section provides that post-petition income will become property of the bankruptcy estate in individual consumer cases under chapter 11."[15]

The amendment did not go without comment. Senators Leahy, Kennedy, Feingold, and Schumer added the following in their Minority Views section of the *Senate Report*:

> At the Judiciary Committee markup, Senator Grassley successfully introduced an amendment to include post-petition earnings for individual chapter 11 debtors as 'property of the estate.' This so-called 'super-rich' amendment, which would have been considered rather controversial had it been vetted among the bankruptcy community, is undoubtedly a significant change to bankruptcy law but is not the direct or most effective method of controlling higher income debtors and in any event is not responsive to our concerns regarding the disparate effects of the bill.[16]

At the same time the Senate debated S. 625, the House was considering a companion bill, H.R. 833.[17] H.R. 833 passed the House on May 5, 1999.[18] The bill as received in the Senate

---

[14] S. 625, 106th Cong., § 321 (as reported by S. Comm. on the Judiciary, May 11, 1999). The provision was not in the bill as introduced in the Senate. S. 625, 106th Cong. (as introduced in the Senate on March 16, 1999).

[15] S. REP. NO. 106-49, at 33 (1999). The report indicates that the amendment was offered by Senator Grassley of Iowa, and that it passed by a vote of 12-5, with Senators Leahy, Kennedy, Biden, Kohl, and Feingold voting nay. *Id.* at 17.

[16] *Id.* at at 114 n.43.

[17] H.R. 833, 106th Cong. (as introduced in the House, Feb. 24, 1999).

[18] The bill passed on May 5, 1999, by a 313-108 vote. 145 CONG. REC. 8629-30 (1999).

6

did not have any provisions for individual chapter 11 debtors.[19]  During its consideration in the Senate, however, the Grassley amendment from S. 625 was inserted into H.R. 333.

More importantly, it was also expanded.  As a result, when the Senate ultimately passed H.R. 333,[20] Section 321 contained not only the original provision regarding personal service income (which had been changed from an amendment to Section 541 to the inclusion of a new Section 1115), but it also contained additional amendments which applied only to individuals in chapter 11.  The list is short, but significant:

- Section 1123 was amended to require an individual's devotion of his or her postpetition service and other income as necessary to implement the plan;
- A "projected disposable income" test was added to Section 1129(a) as new paragraph (14);[21]
- An individual's discharge was delayed until the completion of plan payments; and

---

[19]H.R. 833, 106th Cong. (as received in the Senate, May 12, 1999).

[20]The bill as passed by the Senate was nominally H.R. 833.  Earlier, however, the Senate had struck the text of H.R. 833, and inserted the text of S. 625 in its place.  146 CONG. REC. 532 (2000).  The version passed contained the Grassley amendment as expanded.  *See* 146 CONG. REC. 712-13 (2000).

[21]This became current Section 1129(a)(15).  The change in designation from paragraph (14) to paragraph (15) was made in the next session of Congress.  H.R. 333, 107th Cong., § 321(c)(1) (1999).
   This redesignation, however, introduced a disconnect in the cross-reference.  As originally introduced in H.R. 833, the cross-reference in Section 1129(b)(2)(B)(ii) was to then-paragraph (14) — the paragraph which has since been become paragraph (15).  In the next session of Congress, however, H.R. 333 changed paragraph (14)'s designation to paragraph (15).  *See* H.R. 333, 107th Cong., § 321(c)(1).  The bill did not, however, change the cross-reference in proposed Section 1129(b)(2)(B)(ii); it continued to refer to paragraph (14).  H.R. 333, § 321(c)(2).  This is not an entirely absurd mixup.  Paragraph (14) as added and as ultimately adopted requires a plan proponent to ensure that all postpetition domestic support obligations are current as of confirmation.  One could easily assume that Congress wished to protect domestic support creditors by not allowing a debtor to keep any postpetition earnings — a form of Section 1115 property — so long as any domestic support obligation was not current.
   Although there may be cases in which this erroneous cross-reference may matter, this is not one.  The rejecting creditor here did not raise an object under existing Section 1129(a)(15), *see* note 4, *infra*, and thus the issue is not presented on this record.

7

- A new section on plan modification was inserted.[22]

There was one final change. The bill included a proposed change to Section 1129(b)(2)(B)(ii) consisting of the language italicized above.[23]

Congress passed the substance of H.R. 833 after the 2000 elections, but President Clinton refused to sign the bill, and it was thus "pocket-vetoed."[24] Bankruptcy reform thus had to be reintroduced in the 107th Congress.

Reintroduction came soon. On January 31, 2001, H.R. 333 was introduced in the House.[25] This version contained the expanded version of Senator Grassley's Senate amendments related to individuals that had passed both the House and the Senate a year earlier.[26] After some minor changes to the overall bill,[27] the House issued a report,[28] and promptly passed it.[29]

H.R. 333 ultimately went to a House and Senate conference in 2002. At conference, the House agreed to the Senate's text, and issued a conference report that contained a description of the expanded amendments related to chapter 11 individuals. It is almost word-for-word

---

[22] H.R. 833, 106th Cong., § 321 (engrossed amendment as agreed to by Senate, Feb. 2, 2000).

[23] H.R. 833, 106th Cong., § 321(c)(2) (engrossed amendment as agreed to by Senate, Feb. 2, 2000).

[24] For a detailed history, *see* Jensen, *supra* at 533-39.

[25] H.R. 333, 107th Cong. (as introduced in the House, Jan. 31, 2001).

[26] *Id.* § 321.

[27] The bill was amended in committee to add what is now Section 1115(b), which allows the chapter 11 debtor to remain in possession of all property of the estate, including post-petition service income. *See* 147 CONG. REC. 2578 (2001).

[28] H.R. REP. NO. 107-3, 107th Cong., 1st Sess. (2001). The report contains the first extended discussion of the expansion of Senator Grassley's amendment. *Id.* at 53-54.

[29] 147 CONG. REC. 2632 (2001).

8

the text used in the earlier *House Report*.[30] This treatment, though somewhat extensive, is purely descriptive.[31] There is no discussion of the policy behind, or purposes of, these changes. And such silence was a hallmark of all successive versions of the bill, none of which altered the text of Section 321.[32] BAPCPA thus inserted into the Bankruptcy Code the changes for individual debtors Congress debated in 1999-2002.

**2. The General Effect of the 2005 Amendments on Individual Chapter 11 Debtors**

This analysis indicates that, although not entirely free from doubt, it appears that Congress inserted the individual chapter 11 provisions to ensure no easy escape from means testing. The template for this effort was to adopt and adapt as much of chapter 13 as possible with respect to individual debtors in chapter 11. Again, these changes to chapter 11 were:

- redefining property of the estate in chapter 11 under Section 1115 along the lines of property of the estate under Section 1306;
- changing the mandatory contents of a plan pursuant to Section 1123(a)(8) to resemble Section 1322(a)(1);
- adding the disposable income test of Section 1325(b) to Section 1129(a)(15);
- delaying the discharge until the completion of all plan payments as in Section 1328(a);
- permitting a discharge for cause before all payments are completed pursuant to Section 1141(d)(5), similar to the hardship discharge of Section 1328(b); and
- the addition of Section 1127(e) to permit the modification of a plan even after substantial consummation for purposes similar to Section 1329(a).

*See* 5 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 368.1 at pp. 368-1 to 368-5 (3d ed. 2000 & Supp. 2006) (correlating new chapter 11 provisions with corresponding chapter 13 provisions).

---

[30] H.R. 107-617, 107th Cong., 2d Sess. 220-21 (2002).

[31] *Id.*

[32] Section 321(c) of BAPCPA is essentially identical to Section 321(c) as it was amended in 2002. *See* Pub. L. No. 109-8, § 321(c) (2005).

9

*See also* Markell, *supra* at 75-79.

Although the Senate minority who opposed the provisions when they were first offered characterized these provisions as for the "super-rich," that strength of that categorization dissolved as the bill proceeded towards enactment. What remains is a sort of hybrid chapter 13, in which many of the provisions of chapter 13 sit uneasily in chapter 11.[33]

## III. ANALYSIS OF AMENDED SECTION 1129(b)(2)(B)(ii)

As indicated above, before 2005, the authorities were pretty much in agreement that the absolute priority rule applied to individuals in chapter 11. That meant that a individual debtor could not retain any property if his or her creditors were not paid in full. After 2005, however, this changed. By the process outlined above, Congress decreed that, even in cramdown, an individual "debtor may retain property included in the estate under Section 1115, subject to the requirements of subsection (a)(14) of this section."

*A. The Scope of the Amendment*

This shifts the focus to the meaning of this added language, and that inquiry starts with Section 1115. Section 1115, also added in 2005, in turn provides that property of the estate is different for an individual chapter 11 debtor than other chapter 11 debtors. Section 1115 states:

> (a) In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541 —[34]
> (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs

---

[33] A good example is the addition of the disposable income test in Section 1129(a)(15). In chapter 13, the disposable income test is a protection designed to overcome objections that creditors may not vote on a chapter 13 plan; one rationale is that if a debtor is providing all of his or her projected disposable income to the payment of his or her debts, no rational creditor could object. But when this test was imported into chapter 11, the plan proponent was not excused from also balloting its unsecured creditors under Section 1129(a)(8). So a plan proponent faces the possibility that it can have an accepting class of unsecured creditors, but still have to meet the disposable income test of paragraph (15) due to the objection of just one of those creditors.

[34] "The commencement of a case . . . creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held . . . Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).

10

first; and

(2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first.

Section 1115 thus defines property of the estate for an individual chapter 11 debtor via a two-step process. Initially, Section 1115 creates a baseline estate of all the property covered by Section 541. It then adds to that one class of property excluded for other chapter 11's by Section 541(a)(6): postpetition income from services.

So far, so good. But other than postpetition income from services, what else, if anything, changes? That depends on what the meaning of the ambiguous phrase in Section 1129(b)(2)(B)(ii) that an individual debtor may retain "property included in the estate under section 1115."[35]

If "included" means only property which is added by Section 1115, then Section 1129(b)(2)(B)(ii) has a very narrow meaning: it refers only to postpetition income from services – and not to property originally specified in Section 541. Section 1115, however, itself includes Section 541(a) property. Thus, "included" could refer to all property Section 1115 itself references, and this would then be a reference to the superset of Section 541(a) property *and* the debtor's postpetition service income. Put another way, if Section 1115 entirely supplants Section 541 by specifically incorporating it and adding to it, the "included" has a very broad meaning, essentially exempting individuals from the absolute priority rule as to unsecured creditors.

The narrowness of the narrow reading is underscored by other changes made at the same time as the addition of Section 1129(b)(2)(B)(ii) and which were outlined above. One of

---

[35] Section 1115(a)(1) also added "all property of the kind specified in Section 541 that the debtor acquires after the commencement of the case," but this would seem to be at least partially duplicative of Sections 541(a)(6) and (7), which already add "proceeds, products, offspring, rents or profits of property of the estate" and "[a]ny interest in property that the estate acquires after commencement of the case." An argument exists that Section 1115(a)(1) brings into the estate gifts to the debtor (as opposed to the estate) through the language including "all property of the kind specified in Section 541 that the debtor acquires after the commencement of the case . . . ."

11

those changes, Section 1123(a)(8), requires the following:

> (8) in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

11 U.S.C. § 1123(a)(8). In addition, as also indicated above, BAPCPA added paragraph (15) to Section 1129(a) which now reads as follows:

> (15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—
> (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
> (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

11 U.S.C. § 1129(a)(15). While the rejected creditor here has not objected to the plan by filing an objection or otherwise making any election under paragraph (15), *see* note 4 *supra*, the existence of the paragraph must be taken into account when construing Section 1129(b)(2)(B)(ii).[36] When read together, the intent seems to be that there will be cases, perhaps constituting the majority, in which an unsecured creditor will reject a plan and then object to it separately so that the debtor will be forced to commit value equal to five-years' worth of earnings to the plan – earnings that are property of the estate under Section 1115.

This changes the role of Section 1129(b)(2)(B)(ii). A debtor can't really be said to "retain" property or income that the Code requires to be committed to plan payments. Thus, if Section 1129(b)(2)(B)(ii) is read narrowly, it only covers the debtor's income starting five years after confirmation. As this court has said in another context, "[t]he reader is left with two widely different results: miserly post-fifth-year income on one side, and generous

---

[36]Congress introduced the two provisions together, and only a scrivener's error separates them in the current statutes. *See* note 21, *infra*.

12

designation of all estate property on the other."[37]

*B. Statutory Interpretation Principles*

This issue thus raises significant questions of statutory interpretation.[38] In this court's view, the starting point is the presumption is that Congress intended the accepted and plain meaning of the words it used. As the Supreme Court has said:

> The starting point in discerning congressional intent . . . is the existing statutory text . . . and not the predecessor statutes. It is well established that "when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.

Lamie v. United States Trustee, 540 U.S. 526, 534 (2004), (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000) (internal quotation marks omitted), in turn quoting United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241(1989), in turn quoting Caminetti v. United States, 242 U.S. 470, 485 (1917).

In determining the appropriate sense of the words Congress chose, it is appropriate to investigate the context in which English and the Bankruptcy Code employs the same or similar words. Rousey v. Jacoway, 544 U.S. 320, 326-27 (2005) (looking at use of "on account of" in provisions of the Bankruptcy Code other than the one at issue). Put another way, the meaning of statutory language is best revealed by examining not only the general usage in English of the chosen words, but also through a coordinate review of any specialized use of those terms in the code in which they are found. *Id.*; *see also* John F. Manning, *What Divides Textualists From Purposivists?*, 106 COLUM. L. REV. 70, 79-80 (2006).

In conjunction with this general examination, as indicated above, a court should also examine, in the case of an integrated and cohesive statute such as the Bankruptcy Code, how that code uses or employs the words or phrase in dispute. "[T]he words of a statute must be

---

[37]Markell, *supra* at 90.

[38]This court has previously attempted to use standard tools of interpretation to construe the confusing text of BAPCPA. *See, e.g.*, *In re* Slusher, 359 B.R. 290, 295-96 (Bankr. D. Nev. 2007); *In re* Trejos, 352 B.R. 249, 254-259 (Bankr. D. Nev. 2006), *aff'd*, 374 B.R. 210 (B.A.P. 2007); *In re* Kane, 336 B.R. 447 (Bankr. D. Nev. 2006).

13

read in their context and with a view to their place in the overall statutory scheme. . . . Our goal in interpreting a statute is to understand the statute 'as a symmetrical and coherent regulatory scheme' and to 'fit, if possible, all parts into a . . . harmonious whole.'" Am. Bankers Ass'n v. Gould, 412 F.3d 1081, 1086 (9th Cir. 2005) (quoting Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)). *See also* Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S.Ct. 2326, 2336 (2008) (finding to placement and arrangement of statute to be informative of the proper interpretation).

*C. Narrow or Broad Interpretation?*

Given the relatively straightforward reading of the statute supporting the broader reading, and the general rehabilitative aim of chapter 11, the court understands the phrase "in addition to the property specified in section 541" to mean that Section 1115 absorbs and then supersedes Section 541 for individual chapter 11 cases. This construction, in turn, leads to the position that Section 1129(b)(2)(B)(ii)'s exception extends to *all* property of the estate, including such things as prepetition ownership interest of nonexempt property. This conclusion is supported by the revisions in 2005 to bring individual chapter 11's more in line with chapter 13.[39] It is also supported by the few cases to examine the topic.

**1. Case Law**

One of the first reported cases to review the effect of Section 1129(b)(2)(B)(ii) was *In re Bullard*, 358 B.R. 541 (Bankr. D. Conn. 2007). There, a life insurance agent filed for chapter 11. He proposed a plan under which his unsecured creditors were to receive a dividend of approximately 11.9%. *Id.* at 542. The plan also called for him to retain all his postpetition

---

[39]*See* LUNDIN, CHAPTER 13 BANKRUPTCY, *supra* (correlating new chapter 11 provisions with corresponding chapter 13 provisions).

14

income and an automobile acquired postpetition.[40] The unsecured creditor class rejected the plan, but did not file any objection to confirmation.

The court analyzed the amendments to Section 1129(b)(2)(B)(ii) and the addition of Section 1115. It then found that the property intended to be kept by the debtor was "within the purview of Section 1115(a) and the Debtor's retention of the same is not an impediment to Plan confirmation under Section 1129(b)(2)(B)(ii)." *Id*. at 544. In reaching this conclusion, it relied on the *Norton* treatise. *See* 358 B.R. 544 n.10 (quoting 4 WILLIAM L. NORTON, JR., NORTON BANKRUPTCY LAW AND PRACTICE § 84A:1 (2d ed. 2006)). In short, the court found that the broader reading was a natural reading of the statute.

Another early case finding abrogation of absolute priority is *In re* Tegeder, 369 B.R. 477 (Bankr. D. Neb. 2007). There, the debtors owned two businesses, and filed for chapter 11 protection. Their plan did not provide for payment in full of unsecured creditors' debts. It also did not provide for payments to start until near the end of a ten-year plan payout period, although if debtor's projections were correct, the unsecured creditors would receive close to 95% of their claims. *Id*. at 480-81. The unsecured creditor class rejected the plan.

Relying on the plain reading of Section 1129(b)(2)(B)(ii), the court concluded that "[s]ince § 1115 broadly defines property of the estate to include property specified in § 541, as well as property acquired post-petition and earning from service performed post-petition, the absolute priority rule no longer applies to individual debtors who retain property of the estate under § 1115." 369 B.R. at 480. It thus confirmed the plan. Again, the court relied on a natural reading of the statute in following the broad interpretation.

Relying on *Tegeder*, *In re* Roedemeier, 374 B.R. 264 (Bankr. D. Kan. 2007) also found that Congress eliminated the absolute priority rule for individual chapter 11 debtors. Roedemeier was a dentist who had filed for chapter 11. His filing was caused by overhanging guaranty liability he incurred in an earlier dental partnership. *Id.* at 266. Throughout the case,

---

[40]The debtor also retained exempt assets, and the court permitted that relying on *In re* Henderson, 321 B.R. 550, 559-60 (Bankr. M.D. Fla. 2005), *aff'd*, 341 B.R. 783 (M.D. Fla. 2006). *See* 358 B.R. at 545.

15

Roedemeier's income derived from an employment contract with a wholly-owned limited liability dental company he had earlier formed. *Id.*

Roedemeier proposed a plan that used the income from his wholly-owned company to pay his creditors; the plan, however, did not provide for payment in full to unsecured creditors. *Id*. at 268. Indeed, it only proposed to pay unsecured creditors approximately 3% of their claims. *Id*. at 274. An unsecured creditor holding a guaranty from the debtor objected.[41]

The court examined both the narrow and the broad readings of Section 1129(b)(2)(B)(ii). As does this court, *Roedemeier* concluded that "the narrow reading of the new exception in § 1129(b)(2)(B)(ii) would have little impact of this Debtor's (and probably most other individual debtors') ability to reorganize in Chapter 11." 374 B.R. at 275. This point is consistent with the view that "[t]he principal purpose of the Bankruptcy Code . . . to grant a '"fresh start"' to the '"honest but unfortunate debtor."'" Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007) (quoting Grogan v. Garner, 498 U.S. 279, 286 (1991)).

The court then noted that "[t]he broader view of the exception, on the other hand, helps to explain why a number of changes, including the exception, were made to Chapter 11, namely, so that it could function for individual debtors much like Chapter 13 does." 374 B.R. at 275. These other amendments, the court observed, would be meaningless unless the broad reading were adopted. As the court stated:

> If a class of unsecured creditors who are not to be paid in full under an individual Chapter 11 debtor's plan can bar the debtor from keeping any prepetition property (which will nearly always include the debtor's interest in whatever business the debtor engages in) by rejecting the plan and invoking the absolute priority rule—that is, if the new exception in § 1129(b)(2)(B)(ii) is read narrowly—then it is difficult to see what purpose these other, related amendments can serve.

374 B.R. at 276. From this, the court concluded "that Congress intended for the new exception to absolute priority rule for individual chapter 11 debtors to be read broadly." *Id. See also In*

---

[41]Actually, it appears that the creditor did not receive a ballot, and the court adopted the debtor's suggestion that it assume that the creditor would have voted against the plan. This meant that the "class of unsecured creditors must be deemed to have rejected the plan." 374 B.R. at 270.

16

*re* Johnson, 402 B.R. 851, 852-53 (Bankr. N.D. Ind. 2009) (Stating in dicta that "An individual debtor's plan does not need to satisfy the absolute priority rule, 11 U.S.C. 1129(b)(2)(B), and, even though unsecured creditors will not be paid in full, can be confirmed over their objection so long as the plan satisfies the disposable income test of § 1325(b)(2).").

### 2. Rejection of the Narrow Interpretation

Although relatively straightforward, and uniformly adopted by courts, the broad reading is not without problems. It essentially reads the absolute priority rule out of individual chapter 11 cases, but does so in a convoluted manner – arguably indicative that Congress did not fully appreciate the effect of the language it chose.[42] This is especially true given that the addition of provisions requiring provision of the value of future labor[43] effectively overruled *Norwest Bank Worthington v. Ahlers*[44] without any mention of that case in the legislative history.

But counterarguments to these objections are powerful. While "the absolute priority rule has long been a feature of American bankruptcy law," *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 244 (5th Cir. 2009), it is not sacrosanct. Chapter 13 has no absolute priority rule,[45] and as noted above, most of the

---

[42] As stated by one commentator in a related context, "Congress appears to have thought about the problem in its amendment to Bankruptcy Code § 1129(b)(2)(B)(ii) although it may not have thought about the problem enough." RICHARD I. AARON, BANKRUPTCY LAW FUNDAMENTALS § 12.23.1 (2009).

[43] Section 1123(a)(8) requires an individual chapter 11 debtor to include in the plan all postpetition earnings from services as is necessary to fund the plan. Section 1129(a)(15) then requires, as a condition of confirmation, the provision of value equal to at least five years' worth of projected disposable earnings to the plan if the holder of an allowed unsecured claim objects to the plan.

[44] 485 U.S. 197 (1988). *Ahlers* held that if the new value exception to the absolute priority rule survived the enactment of the Bankruptcy Code in 1978, new value could not be satisfied by promised contributions of labor.

[45] Chapter 13 has no "fair and equitable" requirement for confirmation. 11 U.S.C. § 1325(b)(1). The same is true for chapter 12. *Id.* §1225(b)(1).
Before 1952, individual debtors under chapter XI of the Bankruptcy Act had to propose plans that were "fair and equitable." H.R. REP NO. 82-2320, at 21 (1952). Congress deleted the "fair and

17

changes effected by BAPCPA to individual chapter 11 debtors were part of an overall design of adapting various chapter 13 provisions to fit in chapter 11.[46] The broader view also saves Section 1129(b)(2)(B)(ii) from an almost trivial reading; if the narrow view is taken, the section protects only the value of aggregate postpetition earnings payable after the fifth anniversary of plan confirmation.[47] This interpretation is thus consistent with the Ninth Circuit's requirement that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. . . . Our goal in interpreting a statute is to understand the statute 'as a symmetrical and coherent regulatory scheme' and to 'fit, if possible, all parts into a . . . harmonious whole.'" Am. Bankers Ass'n v. Gould, 412 F.3d 1081, 1086 (9th Cir. 2005) (quoting Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)). As the Court said in a nonbankruptcy context, "statutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989). *See also* Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S.Ct. 2326, 2336 (2008) (finding to placement and arrangement of statute to be informative of the proper interpretation).

Here, given the host of change to chapter 11 with respect to individuals, all made with the goal of shaping an individual's chapter 11 case to look like a chapter 13 case, and the relatively simple wording used in both Section 1129(b)(2)(B)(ii) and Section 1115, this court concludes that the broader interpretation is the proper one.

---

equitable" requirement from chapter XI in 1952. Act of July 7, 1952, Pub. L. No. 82-456, § 35, 66 Stat. 420, 433 (1952). As the accompanying House Report stated, "the fair and equitable rule . . . cannot be realistically applied in a Chapter XI [action] . . . . Were it so applied, . . . no corporate debtor where the stock ownership is substantially identical with management could effectuate an arrangement except by payment of the claims of all creditors in full." H.R. REP. NO. 82-2320; *see also* S. REP. NO. 82-1395, at 11-12 (1952).

[46]*See* note 39 *supra*.

[47]Markell, *supra* at 90.

18

## IV. CONCLUSION

Although the Plan was rejected by a class of unsecured creditors, and does not pay such creditors in full, it may still be confirmed. Changes in 2005 to 11 U.S.C. § 1129(b)(2)(B)(ii) modified the absolute priority rule as set forth above to allow these Debtors to keep their business. Accordingly, the Plan is confirmed. The court will enter a separate order confirming the Plan using Official Form 15.

Copies sent to:

BNC MAILING MATRIX

MICHAEL W. CHEN on behalf of Creditor CHASE HOME FINANCE, LLC
yvette@ccfirm.com

JEFFREY A. COGAN on behalf of Debtor MARTIN SHAT
jeffrey@jeffreycogan.com, beaudocs@cox.net

CHRISTOPHER G. GELLNER on behalf of Debtor MARTIN SHAT
cggellner@lvcoxmail.com

EDWARD M. MCDONALD on behalf of U.S. Trustee U.S. TRUSTEE - LV - 11
edward.m.mcdonald@usdoj.gov

RONALD H REYNOLDS on behalf of Creditor BAC Home Loans Servicing LP, servicing agent on behalf of Republic Mortgage, LLC dba Republic Mortgage, its assignees and/or successors in interest
ron@reynoldslawyers.com, paula@reynoldslawyers.com

JEFFREY SLOANE on behalf of Creditor NISSAN-INFINITI LT
lrost@kssattorneys.com, cdilger@kssattorneys.com

U.S. TRUSTEE - LV - 11
USTPRegion17.lv.ecf@usdoj.gov

JEFFREY A. COGAN
3990 VEGAS DRIVE
LAS VEGAS, NV 89108

| | |
|---|---|
| 1 | Countrywide Home Loans Servicing, L.P. |
| 2 | 2380 Performance Drive, Bldg C |
|   | Mail Stop: RGV-C-32 |
| 3 | Richardson, TX 75082 |
| 4 | |
|   | Countrywide Home Loans, Inc. |
| 5 | c/o McCalla Raymer, LLC |
|   | Bankruptcy Department |
| 6 | 1544 Old Alabama Road |
|   | Roswell, GA 30076 |
| 7 | |
| 8 | JPMORGAN CHASE BANK, N.A. |
|   | MOSS CODILIS, LLP @WAMU |
| 9 | 1270 NORTHLAND DR., STE 200 |
|   | MENDOAT HEIGHTS, MN 55120 |
| 10 | |
| 11 | REAL TIME RESOLUTIONS, INC |
|    | 1750 REGAL ROW #120 |
| 12 | POB 36655 |
|    | DALLAS, TX 75235 |
| 13 | |
| 14 | RECOVERY MANAGEMENT SYSTEMS CORPORATION |
|    | 25 S.E. SECOND AVENUE |
| 15 | INGRAHAM BUILDING, SUITE 1120 |
| 16 | MIAMI, FL 33131-1605 |

# # #